## UNITED STATES EXPRESS COMPANY v. THE STATE.

[No. 20,308. Filed February 3, 1905.]

1. STATUTES. — *Construction.* — *Express Companies.* — The term "express companies" in the act of 1901 (Acts 1901, p. 97) is used in a generic sense, and includes copartnerships, associations of persons, individuals, joint stock associations or corporations doing an express business.. p. 200.

2. INDICTMENT AND INFORMATION.—*Charging in Language of Statute.* —*Express Companies.*—Where the statute prescribes a penalty for the refusal of any express company doing business within the State of Indiana to deliver any express package to the consignee, and the affidavit charges that "the United States Express Company * * * did then and there, being an express company doing business within the State of Indiana," etc., such affidavit is sufficient, even though such company is a partnership and not a corporation. p. 201.

3. STATUTES.—*Construction.*—*Express Companies.*—*Delivery of Packages.*—The act of 1901 (Acts 1901, p. 97) providing for the delivery

United States Express Co. *v.* State.

of "express matter to all persons to whom the same is directed" means that such delivery shall be at the residence or place of business of the consignee. p. 202.

4. CARRIERS.—*Express Companies.—Delivery.—Common-Law Duty.*— Ordinarily it is the common-law duty of an express company to deliver packages sent thereby at the residence or place of business of the consignee. p. 202.

5. CONSTITUTIONAL LAW. — *Interstate Commerce.* — *Police Power.* — *Rights of State.*—In the absence of legislation by congress the state may enact reasonable laws under the police power, although they may incidentally affect interstate commerce. p. 204.

6. CARRIERS. — *Interstate.* — *Liabilities.* — *State Laws.* — A carrier, though engaged in interstate commerce, is liable for its nonfeasances and misfeasances according to the laws of the states wherein they are committed. p. 204.

7. CONSTITUTIONAL LAW. — *Interstate Commerce.* — *Express Companies.—Delivery of Packages.*—A state statute compelling express companies under penalty to deliver express packages to consignees at their residences or places of business is not an attempted regulation of interstate commerce, and is valid. p. 208.

8. SAME.—*Power of State to Regulate Express Companies' Rights.*— The State may make any law in reference to the regulation of express companies which is not in violation of the state or federal Constitution. p. 209.

9. SAME.—*Public-Service Corporations.—Private Property.*—Where a person devotes his property to public use or public service, he thereby grants to the public an interest in such use and must submit to be controlled by the public for the common good, and tiring of such control, such person may withdraw the property from such use. p. 210.

10. SAME.—*Harsh Statutes.*—A statute can not be declared unconstitutional because it may be harsh, or because it may not be in accord with the views of the court as to what should be done. p. 212.

11. SAME.—*Police Power.*—Under the police power persons may be deprived of both liberty and property in a sense, and be without redress. p. 213.

12. STATUTES.—*Construction.*—Courts will not construe a statute, where the language does not compel, so as to conflict with the Constitution. p. 213.

13. CONSTITUTIONAL LAW.—*Confiscation.*—The act of 1901 (Acts 1901, p. 97), compelling express companies to deliver packages is not in conflict with section twenty-one of the bill of rights, prohibiting confiscation of private property. p. 214.

From Howard Circuit Court; *James F. Elliott,* Judge.

Prosecution by the State of Indiana against the United

States Express Company. From a judgment imposing a fine of $10 on defendant, it appeals. *Affirmed.*

*Blacklidge, Shirley & Wolf* and *Baker & Daniels,* for appellant.

*C. W. Miller,* Attorney-General, *C. C. Hadley, L. G. Rothschild, W. C. Geake* and *T. S. Gerhart,* for the State.

GILLETT, J.—This action was commenced before a justice of the peace. Appellant was charged with a violation of the act of March 6, 1901 (Acts 1901, p. 97, §3312a Burns 1901). The act (omitting the enacting clause) is as follows: "That all express companies doing business within the State of Indiana shall deliver all express matter to all persons to whom the same is directed, living within the corporation limits of cities within the State having a population of twenty-five hundred or more inhabitants, according to the last preceding United States census, and any express company failing to deliver such express matter shall be fined in a sum not to exceed $100, or less than $10, for each and every offense."

It appears from the evidence upon the trial in the circuit court that on or about July 24, 1902, appellant was engaged in the express business, and that it had an office in the city of Kokomo. On that day the prosecuting witness, Thomas A. Gerhart, who lived in said city, received through the mail a postal card from said company, stating that it had at its office an express package for him, consisting of a box of fruit, and requesting him to call for it. The postal card was addressed to Mr. Gerhart at his residence, No. 395 South Main street in said city. Mr. Gerhart called up the agent by telephone, and informed him that he desired to have the package delivered at his said residence. This the agent refused to do. There was a second refusal on his part in a conversation between the two at the express office, in the course of which the agent stated that the express companies doing business in that city had limited their delivery limits

some two weeks before. The package was addressed to Mr. Gerhart at his residence. Appellant introduced in evidence its articles of association, from which it appears that by articles of agreement certain individuals agreed that said company be organized as a joint stock company, for the period of ten years from April 22, 1854, for the purpose of doing a general express forwarding agency, commission, banking, exchange and insurance business. A capital stock of 5,000 shares, of the par value of $100 each, was provided for, and a board of directors was created, to whom the articles purported to grant extraordinary powers relative to the management of the affairs of the company. It was further provided in the agreement that all deeds of real estate and all bonds, mortgages and other sealed instruments made to and for the benefit of the company should be made to and by the president of the company, and that he might bring and prosecute all suits in law and in equity. It was also stipulated by the writing that the death or disability of a stockholder should not dissolve or affect the business of the company, and it was provided that in case of the decease of any member and his shares of stock coming into the hands of any person who was not legally competent to act the company might purchase such shares at a value to be fixed by appraisement. By a supplemental agreement, made in 1859, the stockholders agreed that the existence of said company should be extended for twenty years from and after the 1st day of May, 1864, and that the board of directors might thereafter from time to time make extensions of the existence of said company as it might deem best, and it is shown by a resolution dated at New York, January 23, 1884, that the directors, purporting to act "pursuant to a legal notice," ordered a further extension for a like period. It also appears that the company had complied with the provisions of §3307 Burns 1901, §2913 R. S. 1881, relative to the filing of a statement in Howard county.

Appellant assigns error in this court as follows: "(1)

The facts stated in the affidavit upon which this prosecution was based do not constitute a public offense. (2) The facts stated in the affidavit and warrant issued thereon do not constitute a public offense. (3) The Howard Circuit Court erred in overruling appellant's motion for a new trial."

1. It is first contended by appellant's counsel that the charge in the affidavit that "the United States Express Company, late of said county, did then and there, being an express company, doing business within the State of Indiana," etc., amounts to an averment that appellant is a corporation, and that the evidence shows that appellant is a partnership. Assuming that, in the absence of proof of the law under which appellant claims to possess the extraordinary powers provided for in its articles, it is not shown that appellant was a corporation, it does not follow that there is any variance between the allegation and the proof. The legislation of this State shows that since 1855 the General Assembly has not only assumed to regulate, but has been familiar with the manner of the organization of, that class of carriers which furnishes express facilities as auxiliary to the public service furnished by corporations operating over railroads and water-ways. Acts 1855, p. 99; Acts 1879, p. 146, §1, §3306 Burns 1901; Acts 1883, p. 107, §1, §3309 Burns 1901; Acts 1901, p. 149, §1, §3312b Burns 1901. The acts cited describe the organizations regulated as all copartnerships, associations of persons, joint-stock associations or companies, and sometimes the word "corporation" is also used. In all of these acts there is the added description, "usually called express companies." In the light of the legislation referred to, it is clear that when the act under review was adopted the words "all express companies doing business within the State of Indiana" had a settled meaning, and that they were employed in a generic sense. Indeed, any interpretation of the act which so limits its operation as not to include all of those auxiliary organizations which use the railroads and waterways of the State as a means of trans-

porting parcels by express would render the act unconsti-
tutional—an interpretation which this court will only adopt
as a *dernier* resort.  There is no reason whatever for this
interpretation, and we must conclude that the term "express
companies" was employed generically.

2.  Counsel have called our attention to certain early
holdings of this court to the effect that, where an organiza-
tion is described as a company, it will be presumed that it
was intended to aver that it was a corporation.  There is no
occasion to call these rulings in question.  Here we have a
statute which uses the words "express companies" as de-
scriptive of a class, and it is evident that the State is pro-
ceeding against appellant under this enactment.  The words
of the affidavit, "being an express company doing business
within the State of Indiana," are set out by way of induce-
ment.  Matter of inducement need not be set out in the
indictment either so much in detail or with such directness
of charge as those parts are required to be which constitute
the gist of the offense.  1 Bishop, Crim. Proc. (4th ed.),
§554; Clark, Crim. Proc., p. 176.  We do not perceive how
it can be contended with any show of reason, considering
the nature of the matter, that the State may not aver in the
language of the statute that the defendant belonged to the
class against whom the penalty is denounced.  The induce-
ment describes appellant as an express company, and the
proof shows that it belonged to that class of organizations
which the statute describes as companies.  As stated by an
authoritative writer:  "On the general principles of com-
mon-law pleading it may be said that it is sufficient to frame
the indictment in the words of the statute in all cases where
the statute so far individuates the offense that the offender
has proper notice, from the mere adoption of the statutory
terms, what the offense he is to be tried for really is."
Wharton, Crim. Pl. and Pr. (9th ed.), §220.  This is a
matter of settled law in this State.  *Parks* v. *State* (1902),
159 Ind. 211, and cases there cited.  It is competent for the

legislature to provide that a partnership committing a certain act shall be liable criminally. No question of service is presented in this case by the assignment of errors and appellant appeared below by counsel.

3. It is next claimed by counsel for appellant, as we understand them, that the statute does not require a delivery at the residence or place of business of the consignee, but is satisfied with a personal delivery, from which we infer that appellant's position is that the statute may be complied with by holding the package at the local office subject to the call of the consignee. We recognize that criminal statutes are to receive a strict construction, and that courts are not at liberty to explore without the letter of the enactment for the intent of the legislature, but it is nevertheless true that the purpose of the lawmaking power may be ascertained from a consideration of the enactment as a whole, and that it is not to be construed so strictly as to defeat the obvious intent. *State* v. *Hogreiver* (1899), 152 Ind. 652, 45 L. R. A. 504; 2 Lewis's Sutherland, Stat. Constr. (2d ed.), §528. The provision which limits the operation of the statute to cases where the consignee lives within the corporate limits would be meaningless if it were not the purpose of the legislature to require the carrier to do something more than to deliver the package at its own office. In this instance the address upon the package indicated that it was to be delivered at the residence of the consignee, and in such a case the duty of the carrier was plain.

4. It is argued that the act is so general as to amount to an attempt to regulate interstate commerce, and that therefore the enactment is void as a whole. As a proper preliminary to a discussion of the principal proposition thus asserted, we shall consider the duty of a carrier by express in the absence of any statute. Laying aside all question as to the delivery of goods by express at small stations, and also the question of usage as affecting the carrier's obligation, neither of which is an element in the case before us, it

may be said that it is the duty of a carrier by express to deliver packages received by it to the consignee at his residence or place of business. *American Express Co.* v. *Hockett* (1868), 30 Ind. 250, 95 Am. Dec. 691; *Witbeck* v. *Holland* (1871), 45 N. Y. 13, 6 Am. Rep. 23; *American Union Express Co.* v. *Robinson* (1872), 72 Pa. St. 274; *Southern Express Co.* v. *Holland* (1895), 109 Ala. 362, 19 South. 66; *Baldwin* v. *American Express Co.* (1859), 23 Ill. 120 (original ed. 197), 74 Am. Dec. 190; *Gulliver* v. *Adams Express Co.* (1865), 38 Ill. 503; *Hayes* v. *Wells, Fargo & Co.* (1863), 23 Cal. 185, 83 Am. Dec. 89; *Alsop* v. *Southern Express Co.* (1889), 104 N. C. 278, 10 S. E. 297, 6 L. R. A. 271; *Bennett* v. *Northern Pac. Express Co.* (1885), 12 Ore. 49, 6 Pac. 160; note to *Bullard* v. *American Express Co.* (1895), 61 Am. St. 360; Hutchinson, Carriers, §379. In discussing this subject Judge Redfield says: "In turning our attention more specifically to the responsibility of express carriers, the first consideration distinctive of this mode of transportation is, that they are bound to deliver parcels to the persons to whom they are addressed. This was the general rule as to carriers by land, until the introduction of railways. *Hyde* v. *Trent & Mersey Nav. Co.* [1793], 5 T. R. 389. *Stephenson* v. *Hart* [1828], 4 Bing. 476. *Farmers, etc., Bank* v. *Champlain Trans. Co.* [1851], 23 Vt. 186. Since the introduction of railways carriers in that mode have been exempted from personal delivery of their parcels, and allowed to deposit them in warehouses, and thus exonerate themselves from the longer continuance of the responsibility of carriers. *Thomas* v. *Boston, etc., R. Co.* [1845], 10 Metc. 472. But the great necessity of having express carriers arose from this defect in delivery of goods by the ordinary railway transportation; and the same defect also existed in regard to delivery of goods transported by steamboats. They could only deliver at the wharves, and were not expected to employ special messengers and porters to deliver their goods. *Chickering* v. *Fowler*

[1826], 4 Pick. 371. And it is to remedy this inconvenience, and restore the carrying business by land to its former state, in some degree, that express companies have come in use, with the distinctive character of making personal delivery of their parcels to the consignee: Redfield, Railways, §127. This has been so often decided that it is scarcely required that any considerable number of cases should be cited. ⫽This question is considerably examined, and the view just stated fully confirmed, in the case of *Baldwin* v. *American Express Co.* [1859], 23 Ill. 120 [original ed. 197], affirmed, 26 Ill. 504." 5 Am. Law Reg. (N. S.), 7.

5. Having ascertained that the purpose of the statute is merely to require the carrier, under the compulsion of a penalty, to observe its general duty, the question confronts us as to whether the enactment is such an attempted interference with interstate commerce as to make the act void.

The decisions of the Supreme Court of the United States support the proposition that, in the absence of legislation by congress, the state may enact reasonable laws under the police power, which are local in their operation, although they may incidentally affect interstate commerce. *Covington, etc., Bridge Co.* v. *Kentucky* (1894), 154 U. S. 204, 14 Sup. Ct. 1087, 38 L. Ed. 962; *Western Union Tel. Co.* v. *James* (1896), 162 U. S. 650, 16 Sup. Ct. 934, 40 L. Ed. 1105; *Pennsylvania R. Co.* v. *Hughes* (1903), 191 U. S. 477, 24 Sup. Ct. 132, 48 L. Ed. 268. "The matters upon which the silence of congress is equivalent to affirmative legislation are national in their character, and such as fairly to require uniformity of regulation upon the subject-matter involved affecting all the states alike." *Western Union Tel. Co.* v. *James, supra; Mobile County* v. *Kimball* (1880), 102 U. S. 691, 26 L. Ed. 238.

6. In *Chicago, etc., R. Co.* v. *Solan* (1897), 169 U. S. 133, 18 Sup. Ct. 289, 42 L. Ed. 688, the facts were that the plaintiff was injured in Iowa while traveling to Chicago in one of the cars of the company, upon a ticket which pur-

ported to limit the liability of the carrier.   The case involved the validity of a statute holding such carriers to their obligations under the general law.   The court said: "Railroad corporations, like all other corporations and persons doing business within the territorial jurisdiction of a state, are subject to its law.   It is in the law of the state that provisions are to be found concerning the rights and duties of common carriers of persons or of goods, and the measures by which injuries resulting from their failure to perform their obligations may be prevented or redressed. Persons traveling on interstate trains are as much entitled, while within a state, to the protection of that state, as those who travel on domestic trains.   A carrier exercising his calling within a particular state, although engaged in the business of interstate commerce, is answerable, according to the law of the state, for acts of nonfeasance or of misfeasance committed within its limits.   If he fails to deliver goods to the proper consignee at the right time and place, or if by negligence in transportation he inflicts injury upon the person of a passenger brought from another state, the right of action for the consequent damage is given by the local law.   It is equally within the power of the state to prescribe the safeguards and precautions foreseen to be necessary and proper to prevent by anticipation those wrongs and injuries, which, after they have been inflicted, the state has the power to redress and to punish.   The rules prescribed for the construction of railroads, and for their management and operation, designed to protect persons and property otherwise endangered by their use, are strictly within the scope of the local law.   They are not, in themselves, regulations of interstate commerce, although they control, in some degree, the conduct and the liability of those engaged in such commerce.   So long as congress has not legislated upon the particular subject, they are rather to be regarded as legislation in aid of such commerce, and as a rightful exercise of the police power of the state to regulate

the relative rights and duties of all persons· and corporations within its limits.   *   *   *   The statue now in question, so far as it concerns. liability for injuries happening within the state of Iowa—which is the only matter presented for decision in this case—clearly comes within the same principles.   It is in no just sense a regulation of commerce.   It does not undertake to impose any tax upon the company, or to restrict the persons or things to be carried, or to regulate the rate of tolls, fares, or freight.   Its whole object and effect are to make it more sure that railroad companies shall perform the duty resting upon them by virtue of their employment as common carriers, to use the utmost care and diligence in the transportation of passengers and goods."

In *Western Union Tel. Co.* v. *James, supra,* it was held that a statute of the state of Georgia requiring telegraph companies, under penalty, to receive dispatches and, on payment of the usual charges, to transmit and deliver them with due diligence, was a valid exercise of the power of the state as applied to messages by telegraph from points outside of and directed to points within the state.   In addressing itself to a consideration of the statute the court said:' "Is it a mere police regulation, that but incidentally affects commerce, such as *Smith* v. *Alabama* [1888], 124 U. S. 465, and which, at any rate, would be valid until congress should legislate upon the subject; or is it of such a nature, so extensive and national in character that it could only be dealt with by congress?   We do not think it is the latter.   It is not at all similar in its nature to the case above cited of *Hall* v. *DeCuir* [1877], 95 U. S. 485.   In one sense it affects the transmission of interstate messages, because such transmission is not completed until the message is delivered to the person to whom it is addressed, or reasonable diligence employed to deliver it.   But the statute can be fully carried out and obeyed without in any manner affecting the conduct of the company with regard to the performance of its duties in other states.   It would not unfavorably affect or embar-

rass it in the course of its employment, and hence until congress speaks upon the subject it would seem that such a statute must be valid.  It is the duty of a telegraph company which receives a message for transmission, directed to an individual at one of its stations, to deliver that message to the person to whom it is addressed, with reasonable diligence and in good faith.  That is a part of its contract, implied by taking the message and receiving payment therefor. The statute in question is of a nature that is in aid of the performance of a duty of the company that would exist in the absence of any such statute, and it is in nowise obstructive of its duty as a telegraph company.  It imposes a penalty for the purpose of enforcing this general duty of the company.  The direction that the delivery of the message shall be made with impartiality and in good faith and with due diligence is not an addition to the duty which it would owe in the absence of such a statute.  Can it be said that the imposition of a penalty for the violation of a duty which the company owed by the general law of the land is a regulation of or an obstruction to interstate commerce within the meaning of that clause of the federal Constitution under discussion?  We think not.  No tax is laid upon any interstate message, nor is there any regulation of a nature calculated at all to embarrass, obstruct or impede the company in the full and fair performance of its duty as an interstate sender of messages.  We see no reason to fear any weakening of the protection of the constitutional provision as to commerce among the several states by holding that in regard to such a message as the one in question, although it comes from a place without the state, it is yet under the jurisdiction of the state where it is to be delivered (after its arrival therein at the place of delivery), at least so far as legislation of the state tends to enforce the performance of duty owed by the company under the general law.  So long as congress is silent upon the subject, we think it is within the power of the state government to enact legislation of the nature of this

Georgia statute. * * * While it is vitally important that commerce between the states should be unembarrassed by vexatious state regulations regarding it, yet on the other hand there are many occasions where the police power of the state can be properly exercised to insure a faithful and prompt performance of duty within the limits of the state upon the part of those who are engaged in interstate commerce. We think the statute in question is one of that class, and in the absence of any legislation by congress the statute is a valid exercise of the power of the state over the subject."

In *Lake Shore, etc., R. Co.* v. *Ohio* (1899), 173 U. S. 285, 19 Sup. Ct. 465, 43 L. Ed. 702, the validity of a statute of Ohio was assailed, which in terms provided that each railroad company "shall cause three, each way, of its regular trains carrying passengers, if so many are run daily, Sundays excepted, to stop at each station, city or village containing over three thousand inhabitants." In delivering the opinion of the court, Mr. Justice Harlan observed: "The statute does not stand in the way of the railroad company running as many trains as it may choose between Chicago and Buffalo without stopping at intermediate points, or only at very large cities on the route, if in the contingency named in the statute the required number of trains stop at each place containing three thousand inhabitants long enough to receive and let off passengers. It seems from the evidence that the average time required to stop a train and receive and let off passengers is only three minutes. Certainly, the state of Ohio did not endow the plaintiff in error with the rights of a corporation for the purpose simply of subserving the convenience of passengers traveling through the state between points outside of its territory."

7. It was held in *United States* v. *Morsman* (1890), 42 Fed. 448, that the "interstate commerce law only applies to common carriers engaged in operating lines of railway, or railway and water lines combined, and that it does not apply to 'express companies' properly so termed; that is to

say, to independent organizations that carry on the express or parcel business in the usual manner, and which do not operate railway lines." Without pausing to consider the correctness of this declaration, we may say that we are satisfied that no federal enactment exists which is at all indicative of a purpose upon the part of congress to regulate the personal delivery of parcels sent by express. See *Pennsylvania R. Co.* v. *Hughes* (1903), 191 U. S. 477, 24 Sup. Ct. 132, 48 L. Ed. 268. It is our conclusion, so far as concerns the objection that the statute is invalid as an attempted regulation of interstate commerce, that it is competent for the state to require carriers of express, under a penalty, to live up to their obligations under the general law, in respect to the delivery of packages in this State, and that therefore the objection is not well taken.

8. It is contended on behalf of appellant that it is not a foreign corporation, that it enjoys no franchises or grants of power from the State, and that therefore it is not subject to legislative regulation in the transaction of its legitimate business. Treating the first premise as correct, it follows that appellant is not subject to control by the State to the same extent that it would be if it were a foreign corporation, but it by no means follows from the premise that appellant and other like associations are not subject to any control by the State, as respects the manner in which they shall transact their business. The power of the legislature concerning domestic affairs, whether it be called police, governmental or legislative power, authorizes it to make all manner of reasonable laws, not forbidden or restrained by the federal or state Constitutions, which look to the regulation of the relative rights and duties of all persons and corporations within the jurisdiction of the State. *Lake Shore, etc., R. Co.* v. *Ohio, supra;* Cooley, Const. Lim. (7th ed.), p. 829; *Parks* v. *State* (1902), 159 Ind. 211, and cases cited.

The public character of the service which express com-

panies perform is shown by the following quotation from *Express Cases* (1886), 117 U. S. 1, 6 Sup. Ct. 542, 29 L. Ed. 791: "The express business * * * has grown to an enormous size, and is carried on all over the United States and in Canada, and has been extended to Europe and the West Indies. It has become a public necessity, and ranks in importance with the mails and the telegraph. It employs for the purposes of transportation all the important railroads in the United States, and a new road is rarely opened to the public without being equipped in some form with express facilities. It is used in almost every conceivable way, and for almost every conceivable purpose, by the people and by the government. All have become accustomed to it, and it can not be taken away without breaking up many of the long-settled habits of business, and interfering materially with the conveniences of social life."

In the case last cited it was held that while it is the duty of railroad companies to carry express matter for the public, yet they can devise their own means for the carriage, provided, of course, there is reasonable promptness and security. It was further held in that case that, as the express company must be reasonably sure of the means required by it for transportation, and as its business on important lines is often so extensive as to require that cars shall be set apart for its use, the railroad company is not under any obligation to furnish other express companies with equal facilities for doing an express business over its line. The result of this has been that there has grown up between the railroad companies and the express companies doing business over them, as was said in *Baltimore, etc., R. Co.* v. *Voigt* (1900), 176 U. S. 498, 511, 20 Sup. Ct. 385, 44 L. Ed. 560, "to a certain extent, a sort of partnership relation * * * in carrying on a common-carrier business."

9. The only logical ground on which these carriers by express can justify their existence, as pointed out by Judge Redfield, is as an auxiliary to carriers by railroad and boat,

which can only make warehouse delivery. It would be a strange and startling doctrine that by failing to assume the corporate capacity express companies, which have grafted themselves onto public corporations that enjoy the grant of extraordinary powers from the state, and which divide with them the profits of a business, in the proper performance of which the entire public has an interest, can take up a local habitation and do business in the state, and yet successfully defy the effort of the lawmaking power to compel them to live up to their common-law obligations. Such a view of the law is profoundly erroneous. In the case of *Munn* v. *Illinois* (1876), 94 U. S. 113, 125, 24 L. Ed. 77—a case of which it at least may be said that it is one of the most important cases which the Supreme Court of the United States ever decided, since it settled the question as to the power of the state reasonably to regulate the conduct of those who are engaged in the performance of a service which is clearly of a public character—it was said that under the powers of government "it has been customary in England from time immemorial, and in this country from its first colonization, to regulate ferries, common carriers, hackmen, bakers, millers, wharfingers, innkeepers, etc., and in so doing to fix a maximum of charge to be made for services rendered, accommodations furnished and articles sold. To this day, statutes are to be found in many of the states upon some or all these subjects; and we think it has never yet been successfully contended that such legislation came within any of the constitutional prohibitions against interference with private property. * * * This brings us to inquire as to the principles upon which this power of regulation rests, in order that we may determine what is within and what without its operative effect. Looking, then, to the common law, from whence came the right which the Constitution protects, we find that when private property is 'affected with a public interest, it ceases to be *juris privati* only.' This was said by Lord Chief Justice Hale more than two hundred

years ago, in his treatise De Portibus Maris, 1 Hargrave, Law Tracts, 78, and has been accepted without objection as an essential element in the law of property ever since. Property does become clothed with a public interest when used in a manner to make it of public consequence, and affect the community at large. When, therefore, one devotes his property to a use in which the public has an interest, he, in effect, grants to the public an interest in that use, and must submit to be controlled by the public for the common good, to the extent of the interest he has thus created. He may withdraw his grant by discontinuing the use; but, so long as he maintains the use, he must submit to the control." While the courts have had frequent occasion since to pass upon cases which it was contended were ruled by this case, yet its essential doctrine of the right reasonably to regulate the conduct of both corporations and individuals engaged in the performance of duties which are clearly of a public character. has never been departed from. See *Cotting* v. *Kansas City Stock Yards Co.* (1901), 183 U. S. 79, 22 Sup. Ct. 30, 46 L. Ed. 92. We do not think that further discussion upon this branch of the case is necessary.

10. It is urged on behalf of appellant that the act is a deprivation of liberty and of property without due process of law, and that it is for this reason in contravention of the fourteenth amendment. Preliminary to a discussion of this objection attention may be called to the fact that a constitution is presumed to relate to that which was recognized by the people as vital and fundamental, and that a legislative enactment is not to be overthrown because the court may be of opinion that it is harsh in its operation, or that it would have been wiser to have allowed a larger freedom to the individual. As was said by Mr. Justice Holmes in *Otis* v. *Parker* (1903), 187 U. S. 606, 23 Sup. Ct. 168, 47 L. Ed. 323: "While the courts must exercise a judgment of their own, it by no means is true that every law is void which may seem to the judges who pass upon it excessive, unsuited to its

ostensible end, or based upon conceptions of morality with which they disagree. Considerable latitude must be allowed for differences of view, as well as for possible peculiar conditions which this court can know but imperfectly, if at all. Otherwise a constitution instead of embodying only relatively fundamental rules of right, as generally understood by all English speaking communities, would become the partisan of a particular set of ethical or economical opinions, which by no means are held *semper ubique et ab omnibus.*"

11. Under the police power persons may be deprived of both liberty and property, at least in a sense, and that without redress, provided that it be by due process of law. Of course, the mere act of the legislative power does not necessarily amount to due process of law, or, what is its equivalent, the law of the land. *McKinster* v. *Sager* (1904), 163 Ind. 671, and cases there cited. However, every presumption must be indulged by the courts which the circumstances reasonably admit of that the legislative authority was warranted in enacting the statute. "While it may be conceded that, generally speaking, among the inalienable rights of the citizen is that of the liberty of contract, yet such liberty is not absolute and universal. It is within the undoubted power of government to restrain some individuals from all contracts, as well as all individuals from some contracts." *Frisbie* v. *United States* (1895), 157 U. S. 160, 165, 15 Sup. Ct. 586, 39 L. Ed. 657. It was held in *Patterson* v. *Bark Eudora* (1903), 190 U. S. 169, 23 Sup. Ct. 821, 47 L. Ed. 1002, that an act of congress providing that it should be unlawful to pay any seaman's wages in advance of the time that he had actually earned the same was valid, because the obligations of the sailor and his temptations in foreign ports were such as to make the restriction a reasonable one.

12. We have before us the concrete case of a failure upon the part of the express company to deliver a package to the consignee at his residence, as it was implied it would

do from the acceptance of the package so addressed. The statute is so far lacking in specific requirement that the court might imply an exception in favor of a case where, as a matter of volition, there had been a contract entered into to make the carrier's agent the agent to receive delivery. "The general terms of a statute are subject to implied exceptions founded on the rules of public policy, and the maxims of natural justice, so as to avoid absurd and unjust consequences." 2 Lewis's Sutherland, Stat. Constr. (2d ed.), §385; *Tsoi Sim* v. *United States* (1902), 116 Fed. 920, 54 C. C. A. 154. The court will not adopt a construction of a statute which the words do not impel it to, when to do so would be to bring the enactment in conflict with the fundamental law. *People, ex rel.,* v. *Board, etc.* (1851), 13 Barb. 400, 409; Endlich, Interp. of Stat., §§178, 179. It will be time enough when it arises to deal with a case where it appears that what is in form a contract is only modal or has been exacted by the carrier. See *Baltimore, etc., R. Co.* v. *Voigt* (1900), 176 U. S. 498, 506, 20 Sup. Ct. 385, 44 L. Ed. 560; *Lake Erie, etc., R. Co.* v. *Holland* (1904), 162 Ind. 406, 63 L. R. A. 948.

13. The last contention assigned as a ground for the overthrow of the statute is that it is in violation of §21 of the bill of rights of the Constitution of Indiana. We content ourselves upon this point with the statement that we do not perceive that the statute contravenes said section.

Judgment affirmed.